## FACTOR v. HUMPHREY.
### Civ. No. 1359.

District Court, D. Minnesota,
Third Division.

Sept. 10, 1947.

Jesse H. Brown, of Chicago, Ill., and William L. Prosser and Henry E. Halladay (of Dorsey, Colman, Barker, Scott & Barber), both of Minneapolis, Minn., for petitioner.

Victor E. Anderson, U. S. Atty., and James J. Giblin, Asst. U. S. Atty., both of St. Paul, Minn., for respondent.

NORDBYE, District Judge.

The petitioner appeared in person and testified under oath, and offered other testimony and evidence in support of his petition. The respondent offered evidence in support of his return to the writ. Petitioner claims he is illegally incarcerated at the Federal Correctional Institution at Sandstone, Minnesota, of which G. W. Humphrey, the respondent, is Warden. He alleges that his plea of guilty was entered through fear, and thereby he was coerced and his plea was not voluntary. He further asserts that the Court knew that his plea was not voluntary at the time sentence was imposed. It is his position, therefore, that his constitutional rights were violated and that all proceedings with respect to the sentence and judgment on the involuntary plea were void and hence his incarceration is illegal.

The factual situation, as the Court finds the same from all the evidence, appears to be as follows: On August 20, 1942, in the Northern District of Iowa, an indictment was returned by the Grand Jury of the United States charging John Factor and others in Counts 1 to 23, inclusive, with using the mails in a scheme to defraud in violation of Title 18 U.S.C.A. § 338, and in Count 24 charging a conspiracy to commit a crime against the United States in violation of Title 18 U.S.C.A. § 88. The offenses set forth in the indictment involved the fraudulent use of the mails in obtaining from certain individuals who held whiskey warehouse receipts, the evidence thereof, and by giving to such individuals worthless bottling contracts, which were supposed to afford the holder a more lucrative investment.

On September 22, 1942, the petitioner was arraigned on the indictment in the United States District Court at Cedar Rapids, Iowa. He was represented by counsel, and at that time entered a plea of not guilty. Trial was set for November 23, 1942. On October 9, 1942, one Roger Touhy and one Basil Banghart, with others, escaped from the Illinois State Penitentiary. Touhy and Banghart had been convicted in 1934 in Cook County, Illinois, of having kidnapped for ransom the petitioner, John Factor, and were sentenced to a term of 99 years in the Illinois Penitentiary. Their conviction was largely due to the testimony of John Factor, who identified them at the trial as his kidnap-

pers. Both Touhy and Banghart had made known their hatred for Factor and had threatened to take revenge on him if the opportunity was afforded. After their escape, Factor received calls from various newspaper reporters, representatives of the Chicago Police Department, and others, warning him as to the danger he would undergo if he appeared in public places during the time the Touhy gang were at large and the necessity of having police protection. Undoubtedly, during the time Touhy and Banghart were at large, Factor was in fear that harm might come to him and his family if these escaped convicts were given an opportunity to carry out their threats of revenge. During this time he sought to avoid appearances in public places as much as possible, and for a time, at least, while residing in Chicago, he was given police protection. That Factor worried over the situation and became nervous and apprehensive is fairly established.

In the proceedings against Factor in the Northern District of Iowa, he was represented by eminent and experienced counsel, and on or about October 28, 1942, one of Factor's counsel, Guy P. Linville, former United States Attorney for the Northern District of Iowa, and later a judge of the District Court at Cedar Rapids, Iowa, and Tobias E. Diamond, United States Attorney for the Northern District of Iowa, called upon the Honorable Robert C. Bell, of the District of Minnesota, who had been assigned to the Northern District of Iowa on account of the illness of the judge of that District. The conference with Judge Bell was suggested by counsel for Factor and counsel for some of the other defendants for the purpose of discussing with the United States Attorney in the Court's presence any recommendation which the United States Attorney might make if a plea of guilty was entered by these defendants. The suggestion was made that Factor desired to make restitution to the parties claimed to have been defrauded, and it was by reason of the proposed restitution, if effected, that counsel for Factor desired to have the United States Attorney indicate a recommendation for probation, or at least leniency, if a plea of guilty was entered by him. This conference did not result in procuring any recommendation from the United States Attorney if a plea of guilty was to be entered, but the tentative arrangement was nevertheless that Judge Bell should plan to be present at Cedar Rapids on November 7, 1942, to receive the pleas of guilty from Factor and from at least three of the other defendants. Later, Judge Bell was notified by the United States Attorney that this tentative arrangement had fallen through, and that it was not necessary for him to be in Cedar Rapids on that date. Some time after November 7th, and before November 17, 1942, however, Judge Bell was again visited by Factor's lawyers. Judge Bell was a witness at the habeas corpus hearing, and it is his recollection that Guy Linville and Thomas W. McMeekin, of St. Paul, a lawyer of broad experience in criminal litigation, represented Factor at that time and were together when the visit was made. According to Judge Bell, they desired to know if he would come to Cedar Rapids before November 23rd, when the Factor case was set for trial. Mr. Linville informed Judge Bell that he was convinced that Factor was guilty; that he had advised him to plead guilty and that Factor intended to enter such a plea. However, it was pointed out to Judge Bell that the Touhy gang were still at large; that there had been a great deal of publicity in the Press as to the trial of Factor on November 23rd at Cedar Rapids and that they desired to advance the date when he would appear in court so that he could enter a plea of guilty and thus avoid appearance on the publicized date, as it was feared that the Touhy gang might try to take revenge on him at that time. There was nothing said to Judge Bell to the effect that the plea of guilty was made because of fear of the Touhy gang, but only that the date of Factor's appearance in court to enter a plea of guilty should be advanced for the reasons indicated. Judge Bell acquiesced in their request, and on November 17, 1942, at Cedar Rapids, Factor was in court with his counsel according to the arrangement made, and at that time the plea of not guilty for Factor was withdrawn and he entered a plea of guilty. Mr. Linville stated at that time: "The defendant here-

tofore entered a plea of not guilty. He is represented by Mr. McMeekin and myself and we have entered our praecipe for our appearance in the office of Clerk of this Court. I think in our former plea the defendant stated that his true name was John Factor, and the defendant at this time withdraws his plea of not guilty and enters a plea of guilty." Whereupon, Judge Bell stated, "Is that correct?" And Mr. Factor answered: "Yes, sir."

The Court then referred the matter to the Probation Officer for a pre-sentence investigation and report. Counsel for Factor requested that the imposition of sentence be deferred until the April, 1943, term of court at Cedar Rapids to enable Factor to make restitution and that such time would be necessary, and that the pre-sentence report should not be presented to the Court until Factor had been able to make reasonable restitution, so that the report would reflect the restitution thus made. The Court thereupon continued Factor's bail and continued the matter to such date in the future as the Court would thereafter designate.

The United States Probation Officer at Chicago, Illinois, assisted in the pre-sentence investigation. Factor made a report to him of the "alleged victims" and the amounts due them. He concluded one letter by stating, "Therefore, the total amount of whiskey which was taken from these people and sold, amounted to $102,-760.00, which, together with the $44,990.00 in cash, makes a total of $147,750.00 with which the above list of victims have parted, and for which I am making restitution, as stated in my previous report." In another letter to the Probation Officer, evidently written after January 12, 1943, he listed the restitution he had made to the alleged victims between December 20, 1942, and January 12, 1943, as totaling $15,034.57.

On December 29, 1942, Roger Touhy and Basil Banghart were captured and returned to the Illinois Penitentiary. That fact was made known to Factor within 48 hours thereafter. Factor was out on bail from November 17, 1942, to February 2, 1943, when he was ordered by the Court to appear at Cedar Rapids. On that date he appeared before Judge Bell with his coun-

sel. At the opening of court, a motion was made in his behalf to continue the imposition of sentence to the April, 1943, term to enable him to make further restitution, his counsel stating, in part: "I want to say further that in making this motion and in making this restitution, we do not entertain any thought that that is a defense, but we make this motion and offer because we conscientiously believe it should be made and we want to make it—and we do want to point out this thought, that restitution is always something that justifies a plea of leniency to the court, and the more restitution that is made perhaps the more recognition the court might give it * * *."

The United States Attorney opposed the motion, and it was denied by the Court. Thereafter, the United States Attorney made a long statement regarding the details of the offense and the participation and claimed complicity of Factor in the various acts of fraud and conspiracy, and moved for sentence. This statement of the United States Attorney precipitated a long reply from Mr. McMeekin, one of Factor's counsel, in which he questioned the United States Attorney's statement as to the complicity of Factor as outlined by the prosecutor, stating, in part: "It seems to me, Your Honor, that it is perfectly evident by the nature of the District Attorney's argument that this is a situation with which lawyers are frequently, and unfortunately too frequently, confronted with when their clients come into court and enter pleas of guilty. It is easy enough for the United States Attorney, and those with whom he has been cooperating and working with for a long period of time, to look at certain evidence that comes to their attention and dissect it and to turn it in their way and see it only in the light which would best preserve and support their case."

Factor's counsel then proceeded to attempt to demonstrate to the Court that Factor was not directly connected with the so-called victims or investors, as the United States Attorney had outlined, and in the course of his statement, and in referring to the kidnapping of Factor by the Touhy gang and his cooperation with the Government in that case, Mr. McMeekin made the following statement: "At the

time he entered his plea of guilty, Factor was constantly, hourly and daily in fear of his life, in view of the continued threats made against him by those involved in this kidnapping. They were then extant, and had just escaped from prison, and it was under such circumstances and conditions as those, that we had this case advanced to take his plea, it was advanced one week, because we knew the situation and asked to have it done."

And then counsel ended his plea to the Court by stating: "So, Your Honor, relying upon the truth of that probation report, with which I am sure Your Honor is completely and entirely familiar and trusting and believing that that report is an honest and truthful one, and without being able to further answer the arguments of the District Attorney because we know not whereof he speaks, I beg and plead with Your Honor that in this case, regardless of how the Government seeks to place this defendant upon the pedestal, that leniency be shown to him, and that, within Your Honor's wisdom and judgment, if possible, so that these people, these so-called victims and those who have lost their money may benefit, that whatever sentence may be imposed may be continued at least to some extent upon substantial restitution on his part, and that if any time it is afterwards shown that he has not borne the faith, that he has not kept the faith with the court, if the court should give him the opportunity to keep such faith, that sentence or mitimus shall issue and the probation be revoked, and we now place ourselves, Your Honor, into the hands of the court. I thank you."

There was further colloquy between the United States Attorney and Mr. McMeekin, whereupon the Court made the following statement:

"This case was referred to the probation officer for a presentence investigation and report, except as to one of the defendants who entered a plea of guilty today. I have read these reports carefully. They are confidential and yet I never felt more like showing probation office reports to defendants. I think the probation officer has undertaken to give the court the facts. These reports mention former convictions of some of the defendants and it is the duty of the officer to give the court such information, but it appears to me that the officer has been exceedingly careful to state the facts and not to give his conclusions or opinions in connection with these defendants. I have undertaken to make a careful study of these reports so as to be familiar with the facts as eleven men have entered pleas of guilty and it is the duty of the court to impose the sentences. It is a serious duty which the court has to perform. It is an unpleasant duty.

"This is a case where twelve, fifteen, or possibly as many as twenty individuals joined together in a scheme to get money and property illegally. It was a cruel scheme. The facts are evident. Certain individuals throughout the country held whiskey warehouse receipts. So-called salesmen went to these individuals and took their warehouse receipts from them by negotiating with them and substituting in place of the warehouse receipts worthless bottling contracts. In some instances warehouse receipts were traded to various persons for cash or securities. Sometimes these warehouse receipts that were sold to the customers were later taken away from them and bottling contracts substituted.

"It appears that a very large sum of money was obtained from the individuals with whom the defendants dealt. The Securities and Exchange Commission reports show approximately one million two hundred thousand dollars, possibly that was the face value of the securities. In some instances the securities were not worth their face value but unquestionably there were securities that were obtained and sold for very large sums of money, many hundreds of thousands of dollars. Approximately half a million dollars were obtained from sixteen individuals. The Fulton family $338,000.00, Tula McFarland $17,000.00, Charles Kraft more than $60,000.00, Monsignor Malloy $10,000.00, Mary Huntsacker $40,000.00, Olga Goehringer $22,000.00, and a number of others bringing the total to more than a half a million dollars.

"Today these people have nothing for their money, or substantially nothing.

They did not get value received. That is a situation which stares the court in the face.

"The next important phase of this case that this court must consider is whether these defendants intended that these people should ever have anything for their money and property and whether the defendants were in a position ever to repay or return to these people their property. The talking point used by the salesmen was to the effect that they were going to take the whiskey, bottle it and put it on the market at retail and thereby make large profits for the so-called investors. There were three corporations used in connection with the business and not one of them had a license to bottle, or a bottling plant, or any sort of an organization that would enable any of the three corporations, or any of the defendants, to bottle or to market whiskey except the ownership of three retail whiskey stores for a short period of time in the City of Chicago. Obviously, the defendants had no means of returning to the Fultons, or any of the other investors, the large sums of money and property taken from them. These defendants according to my study of the record for the most part are intelligent men who have the intellect and ability to conduct a substantial business. They were not mistaken as to the nature of their enterprise. Most of these defendants played the part of salesmen; they went out and dealt with various people who invested their money. I think that is true of all except possibly Factor and there is some evidence of an instance or two where he secured whiskey warehouse receipts or sold whiskey warehouse receipts to persons with whom he dealt. That has been the subject of detailed discussion by the United States Attorney and counsel for the defendant.

"This is the situation as to Factor: he was connected with the three corporations that were used in connection with the scheme. As I gather it from the reports that have been made and the testimony that was introduced in the trial, the defendant Factor was the head of the entire enterprise and had control of the bank accounts. He was the treasurer and the money passed through his hands. It was deposited in banks and was checked out by him. I shall not undertake to relate in detail the records in that connection but they show that Factor had an important part in the business of the three corporations and of the conduct of the scheme."

Thereupon, the Court stated to Factor: "Have you any reason to offer why sentence should not be imposed at this time?" And Mr. Factor replied: "Your Honor, as my attorney has stated, I have little chance to refute the statements made by Mr. Diamond. I pleaded guilty, Your Honor, because my life was threatened; I was threatened that I would be killed in this courtroom. That was the main reason why I pled guilty, Your Honor."

Then the following ensued:

"The Court: Then I regret very much that you entered a plea of guilty in this case. I came to Cedar Rapids so that you could do so at the request of your counsel, and I supposed that it was your desire to enter a plea of guilty because I supposed that you perceived you were guilty.

"Mr. Factor: Your Honor, I had no promise of any character, except that I was prompted by the fact that I was threatened and my family was threatened to be killed in this courtroom, and rather than set through the trial I pleaded guilty.

"The Court: Have you anything further that you desire to say to the Court?

"Mr. Factor: No, Your Honor.

"Mr. McMeekin: I think Mr. Factor meant by that statement, Your Honor, that he wasn't fully advised by his counsel, and did not know the facts. It is true, as he stated, that he was to some extent concerned, and perhaps it was because of that we asked that the plea be advanced.

"The Court: He was apprehensive for the safety of his family, but, of course, that did not justify a plea of guilty in this case unless the defendant recognized the fact that he was involved in this affair.

"Mr. McMeekin: No question about that fact.

"The Court: No question about the result, that there would be no question of a verdict of guilty in this case. Anything further?

"Mr. McMeekin: Nothing further."

The Court thereupon sentenced the defendant Factor on all counts of the indictment for a period of 10 years and to pay a fine in the sum of $10,000. Upon the imposition of sentence, Mr. McMeekin stated: "We move at this time for a stay of execution of sentence. We do that as we would like to help the defendant clean up his business, as his business is in Chicago, and requires his attention. He has a substantial bond and has complied with the terms of that bond at all times. His business is such that it does require his personal attention to prepare himself for this thing."

The motion was denied, but later a stay of execution was granted to February 12, 1943, during which time Factor was released on his continuing bond. He entered upon the service of his sentence on February 12, 1943. No motion was made to withdraw the plea of guilty at any time, or to vacate or set aside the judgment of conviction. No appeal was taken from the judgment of February 2, 1943, nor was any motion made or proceeding had to set aside the judgment up to the time of the filing of this petition for a writ of habeas corpus, some four years after the judgment was entered.

I have set forth in some detail the chronology of the events so that a complete picture may be presented. It may be assumed, without necessarily being decided, that if a plea of guilty is entered through fear and coercion, so that it is not voluntary, the Court would lack jurisdiction to pronounce sentence and the entire proceeding based on such a plea would be void. Further, it may be assumed, without being decided, that a collateral attack on such a judgment may be made in a habeas corpus proceeding. But a consideration of the entire showing herein convinces me beyond any shadow of doubt that the claimed involuntary plea by reason of fear and apprehension is fictitious and utterly devoid of any real foundation.

When Factor's counsel called upon Judge Bell on October 28, 1942, there was no intimation that the contemplated plea of guilty was prompted by any other consideration than that Factor was willing to enter a plea of guilty if the United States Attorney was willing to recommend probation or leniency conditioned upon restitution being made to the victims. When counsel waited upon Judge Bell after November 7th and before November 17, 1942, they reported that Factor was guilty and would be convicted if he stood trial, and that they had recommended to him that he enter a plea of guilty and that he intended to do so. But they were concerned about his appearance in court on the date set for trial because of fear of Touhy's reprisal, and therefore wanted the date of his appearance advanced so as to avoid appearance on the date which had been given so much publicity. Moreover, a fair consideration of Mr. McMeekin's testimony in that regard supports this view. The pertinent portions of his direct and cross-examination are as follows:

"Direct Examination

"By Mr. Brown:

\* \* \* \* \* \*

"Q. Will you state that conversation? A. The case had been set for trial for November 23. I saw Judge Bell and told him that Factor and his associates had escaped prison and was supposed to be—I mean Touhy had escaped prison and was supposed to be out and around and that we were all afraid of the situation if we appeared at the trial on November 23; that I, as well as Factor, was afraid Touhy's crowd might be there and there might be some shooting and I considered the situation a very dangerous one and thought it would be better if the case were advanced.

"Mr. Giblin: I didn't get that last. A. I thought it would be better if the trial of the case were advanced, and I told him at that time if he would advance the case that Mr. Factor was prepared to plead guilty.

"Q. Can you recall anything else that was said? A. I can't recall all of the conversation Judge Bell and I had, but that is the substance of it. And he said that he likewise believed it might be better to have the case advanced and that he would find out what date would be agreeable to Mr. Diamond, as I remember it, and he would let me know. Then later on I received a message from Judge Bell that

he would hear our plea on November 17th at Cedar Rapids.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Have you exhausted your recollection of the substance of the conversation? A. I believe I have. It is over four years ago. I wouldn't want to give all the details, but that is my recollection of the substance of it.

"Q. Can you tell us, Mr. McMeekin, whether or not you advised Judge Bell on that day in that conversation in his chambers Mr. Factor had decided to plead guilty because he was in fear of the Touhy gang? A. Yes, without any question I told him that.

"Mr. Brown: That is all."

"Cross-Examination

"By Mr. Anderson:

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Is it also your testimony that such plea was to be interposed, I believe you said, and you correct me if I am wrong, on account of the Touhy gang being at large? A. I may have said that. I wouldn't want to give my exact language that I used, but in any event I did give as the reason for advancing the hearing the fact that the Touhy gang was at large. I don't know whether Judge Bell asked me or whether I told him why the plea was to be —the plea of guilty was to be entered, except a plea was to be entered in advance.

"Q. Would you state now for the record, in your own words, upon your most serious reflection, just what you said to Judge Bell was the reason for changing the plea of guilt interposed? A. I told Judge Bell that the case had been set for trial for November 23; it was generally known that it was coming up for trial at that time; the newspapers had publicized accounts about it; and that the Touhy crowd were at large and that we all felt that they were out looking for Factor, and threats had been made to Factor; and not only Factor but Judge Linville and myself were afraid of what might happen if and when we appeared in the courtroom on November 23rd. In fact, I told Judge Bell I thought it would be an extremely dangerous situation not only for us and for Factor, but perhaps for him as well if we appeared in the courtroom that day; and I asked him then if he would not consider advancing the case.

"Q. You have now given all that you can recall as having been told by you to Judge Bell as to the reason for the plea of guilt going to be interposed and the plea not guilty withdrawn? A. I told Judge Bell that Factor would plead guilty. I believe Judge Bell asked me if he was going to plead guilty at that time, and I said, 'Yes, he was going to plead guilty.' That is all that I can remember of that meeting."

When the plea was entered on November 17, 1942, neither Factor nor his counsel made any mention to the Court of any fear of Touhy. The fears entertained regarding a court appearance on November 23rd were apparently ended because they had been successful in advancing the date for their appearance in court. It seems obvious that on November 17th Factor and his attorneys were only concerned with obtaining as much time as possible to make restitution in the hope of getting leniency. As stated, Touhy and Banghart were captured on December 29th, and after that date there was no further fear of reprisals from them. After the Touhy gang were captured, no request was made to Judge Bell for a change of plea or public trial now that Factor was saved from his enemies, and when the February 2nd hearing was had over two months after the plea of guilty was entered, counsel for Factor made no reference to any fear of the Touhy gang until after the motion for continuance of the imposition of sentence had been denied and after it was apparent from Mr. Diamond's statement and recital of the facts that he was requesting the Court to consider Factor as one of the main culprits in this gigantic fraud. And Mr. McMeekin's statement on February 2, 1943, as to Factor's fear of the Touhy gang did not inform the Court that Factor's plea was involuntary and entered through fear. True, he did state that, when Factor entered his plea, he was in fear of his life, but not that his plea of guilt was entered for that reason. After Mr. Diamond's

statement to the Court and after the Court's summarization of the situation as recited above, Factor knew that his hopes for probation were scant and that it was improbable that he would receive any leniency. It was then in response to the Court's question as to whether there was any reason why sentence should not be imposed that he sought refuge in a claimed involuntary plea by reason of fear of the Touhy gang. This claim, made for the first time under the circumstances related, plainly indicates that it was a distortion of the true situation and an attempt to wrest an involuntary plea from the circumstances relating to the advancement of the plea of guilty. It was a vain attempt to elicit sympathy from the Court, and it is significant that the only response his statement in this regard evoked from his counsel was, "It is true as he stated that he was to some extent concerned and perhaps it was because of that he asked that the plea be advanced." Able counsel for Factor made no request at that time to the Court that his plea of guilty be vacated, and when the Court, after stating that there would be no question about the result and that there would be no question about a verdict of guilty in the case, asked Factor's counsel, "Anything further?", counsel replied, "Nothing further." To suggest, therefore, that Factor's constitutional rights were violated and that the Court was remiss in his duty because, under the circumstances related, he failed of his own initiative to vacate the plea of guilty and because he imposed sentence on the plea entered on November 17, 1942, is obviously utterly unsound. Factor's belated claim that he was coerced into entering a plea of guilty did not make this claim true. It must be appraised in light of the admitted circumstances. Certainly, it must be deduced that his skilled and experienced lawyers did not believe the claim to be true, or they would have been quick to proceed with an appropriate motion to protect their client, and it is obvious that Judge Bell believed that it was not true. To urge at this late date, therefore, that Factor entered a plea of guilty on November 17, 1942, because of fear, and that therefore his plea was not voluntary, is contrary to every reasonable hypothesis which the undisputed facts suggest. I am convinced that, under the showing made, petitioner's claim of an involuntary plea of guilty is not sustained and that his constitutional rights were in no way violated by the Court's pronouncement of judgment on the plea entered. The petition in habeas corpus for the discharge of the petitioner lacks any real merit, and the application must be denied and the petition dismissed.

The United States Attorney may present appropriate findings of fact and conclusions of law in harmony herewith.

An exception is reserved to the petitioner.